798 So.2d 437 (2001)
S.R.B.R. and J.R.
v.
HARRISON COUNTY DEPARTMENT OF HUMAN SERVICES, by Illona Jones, Social Services Regional Director, and S.C.R., S.N.R., J.S.R., Jr. and M.G.R., Minors, by and through their Next Friend, Illona Jones.
No. 1999-CA-01258-SCT.
Supreme Court of Mississippi.
March 22, 2001.
*438 Thomas L. Musselman, Biloxi, Attorney for Appellants.
Office of the Attorney General by J.D. Woodcock, Jackson, D. Scott Gibson, Attorneys for Appellee.
EN BANC.
COBB, J., for the Court:

STATEMENT OF THE CASE
¶ 1. On May 12, 1997, in a prior action before the Harrison County Family Court, S.R.B.R. and J.R., the natural parents of five minor children, pled nolo contendere to charges of child abuse and neglect. Their children were then ages 15, 14, 9, 8 and 6 years of age. The Harrison County Department of Human Services (DHS), where the children had been placed in February of 1997, continued to have custody of the children.
¶ 2. The family court ordered a reunification plan for the family, under which the parents agreed to attend individual counseling sessions on sexual abuse and other issues until successfully completed. No appeal was taken from this May 12, 1997, judgment of the family court.
¶ 3. Two years later, DHS filed a petition seeking termination of the parental rights of S.R.B.R. and J.R. with regard to their four children who were still minors.[1] Following a trial on the merits, the family court entered its judgment terminating the parental rights of S.R.B.R. and J.R. pursuant *439 to Miss.Code Ann. § 93-15-103(3)(d)(ii) (Supp.2000).
¶ 4. Aggrieved, S.R.B.R. and J.R. timely perfected an appeal to this Court, assigning as error the following issues:
I. THE TRIAL COURT ERRED WHEN IT TERMINATED THE PARENTAL RIGHTS OF THE MOTHER WHEN THERE WAS NO EVIDENCE PRODUCED THAT SHE COMMITTED ANY OFFENSE.
II. THE TRIAL COURT ERRED WHEN IT TERMINATED THE FATHER'S PARENTAL RIGHTS AS NO TESTIMONY WAS OFFERED THAT HE DID NOT ATTEND COUNSELING.
III. THE TRIAL COURT ERRED WHEN IT FAILED TO MAKE ANY FINDINGS OF FACT CONCERNING THE BEST INTERESTS OF THE MINOR CHILDREN IN DETERMINING CUSTODY ISSUES.
IV. THE TRIAL COURT ERRED WHEN IT FAILED TO CONDUCT AN INDIGENCY HEARING WHEN THE PARENTS' ATTORNEY WITHDREW FROM THE CASE FOR LACK OF PAYMENT OF A FEE.
V. THE TRIAL COURT ERRED WHEN IT FAILED TO MAKE ANY FINDINGS OF FACT CONCERNING THE ISSUE OF DURABLE CUSTODY AS TO THE MOTHER.
Finding no manifest error, we affirm the decision of the Harrison County Family Court.

STATEMENT OF THE FACTS
¶ 5. The parents, S.R.B.R. and J.R., have five children. The eldest child, S.C.R., a female, whose date of birth is August 16, 1981 is not a subject of this termination of parental rights case. An independent living plan for her was established by the foster care review board. The four younger children are the subject of this termination of parental rights case.
¶ 6. At the hearing on the petition alleging neglect and abuse, the eldest child testified in open court of the sexual abuse by her father. Concerning that testimony and the resulting plea of nolo contendere, the trial judge later stated, during the termination of parental rights hearing:
The case actually went to trial and [S.C.R.] testified and there's no question in my mind that her father did, in fact, molest her. She talked about he checked her, examined her, to determine if she was a virgin. He used his fingers to open her up, to look into her. She wrote letters about this and it really upset her and bothered her greatly when he did this. That was, that testimony concluded approximately 12:20. We recessed the matter until 1:30, at which time Mr. Woods who, at that, was representing [the father], and Mr. Smith who was representing [the mother], both decided more or less to run the white flag up the pole and plead the case out.
Now, that's exactly what happened. It wasn't like this child did not testify in open court. Rather, she testify (sic) and she was most reluctant in her testimony.
¶ 7. At the hearing on the petition seeking to terminate parental rights, the DHS introduced the trial court's own file on the abuse and neglect case as documentary evidence. The file included letters written by the eldest child to her church youth director, describing a pattern of molestation which occurred over a period of at least three years. The letters written in confidence, seeking advice, evinced desperation, yet a fear of retaliation by her father. *440 The report of these letters initiated the investigation by the DHS.
¶ 8. These records also include the report of the second eldest child, of an act of sexual abuse by her father which appears to have occurred when she was confined to a wheelchair following an accident.
¶ 9. Approximately three months after the abuse and neglect hearing, a letter from a mental health clinician requested the discontinuance of parental visits with the eldest child and informed the DHS that during a visit, the father requested that she recant "so the family can be reunited." The letter continued:
This pattern of pressure from family members has apparently been ongoing in that [S.R.] reported to me that while placed with relatives in Florida she was continuously bombarded with requests to recant. [S.R.] has requested that this information not be disclosed and I am reluctant to break her confidence because it has taken several months for [her] to learn to trust me.... [She] already feels like a traitor in her family because she told about the abuse. I hope that stopping the visitation can be handled in such a way was to prevent [her] from being identified as the cause, thus alienating her further.
¶ 10. The mother admitted to mental health professionals that the father committed the acts as reported by the two girls and said that "it shouldn't have happened". However, the mental health clinic records of the mother demonstrated an unwillingness on her part to acknowledge the acts as sexual abuse. The psychologist's evaluation of the mother was that "[s]he appears to be minimizing the extent and impact of the abuse, although she obviously cares very much for her children...." and that the mother "seems to rationalize his behavior as motivated by parental concern."
¶ 11. Further evaluation of the mother revealed her own abuse as a child. She had been sexually molested by her stepfather beginning at age 13-14, had become pregnant by him, and had obtained an abortion. She related that "nothing was ever done about it" and that when she told her own mother, her mother did not believe her.
¶ 12. The psychologist noted that the mother, S.R.B.R., stated that she was born with cerebral palsy, and that she was taking several medications for nausea and gastrointestinal problems. In diagnosing her as clinically depressed with adjustment disorder, he characterized her as bewildered, confused, and distressed, "preoccupied with physical complaints and illness, to a degree greater than her disability would account for." In the psychological evaluation she was described as passive, as "[a] woman with low self-esteem, not believing in her own abilities to attain the return of her children", and "a woman who would require a lengthy period of safe time away from her husband to separate and individuate." During a counseling session with the mother, a mental health clinician noted the sessions:
Revealed a fearful woman, choosing to place responsibility for her actions with the courts at first while her husband was in jail, and later with her husband. Fear of losing her children by the courts and belief and/or possibly fear of whatever her husband told her and believing him to be the best or only option in terms of personal survival and in obtaining the return of her children.
¶ 13. The clinician testified that the initial sessions with the mother had been productive, but that the mother's attendance ceased abruptly when the father was released from jail. She eventually returned for the next session, with her husband, *441 who waited in the lobby. The clinician testified that the sessions subsequent to that day were unproductive, the last two sessions having been four months apart. The clinician testified that the mother did not successfully complete the Gulf Coast Mental Health Child Sex Abuse Treatment Team Program required by the lower court. There was no proffer of any evidence that either parent completed the Child Sex Abuse Treatment Team Program.
¶ 14. The clinician further testified that there was one "crisis walk-in", which was an unscheduled session approximately six months after the last attendance by the mother at a Sex Abuse Treatment Team Program session. The clinician's recital of her records revealed that the mother and father came "wanting to work together to get their children back home" and that the court had directed them to receive counseling. When the clinician advised the parents that each should have individual therapists, the father replied that he wanted the sessions to be couple sessions, "not individual like Hitler with purpose to divide and conquer". The records showed that the father told the clinician that "DHS wanted him to admit that it did occur" but he denied that it occurred. The records also indicated that "[S.R.B.R.] said she believed her husband." When the clinician made it clear that she felt it was not in the mother's best interest for both parents to attend the mother's sessions, the parents requested that their case at Gulf Coast Mental Health Center be closed. The clinician recommended a private psychologist or psychiatrist but did not know whether the mother or father ever sought private treatment.
¶ 15. Although the parents did not report such efforts, evidence that the parents sought other counseling was admitted. This evidence, however, revealed that at these other counseling sessions the issue of sexual abuse was not addressed and that the father denied any sexual abuse of the children. The character witnesses for the parents knew nothing of the abuse that had occurred.
¶ 16. When she testified in court, the mother denied having acknowledged to the mental health professionals that the abuse of her daughters had occurred. This was in direct conflict with the documentary evidence and testimony of the mental health professionals who testified that she had acknowledged the acts, although she did not consider that to be sexual abuse. Based upon the testimony and documentary evidence, the lower court determined that any prospective maternal protection of the children from further abuse by the father appeared to be improbable.
¶ 17. The children's guardian ad litem recommended that the petition for termination of parental rights be granted. Rather than durable custody, the guardian ad litem recommended adoption by the aunt and uncle in Chicago with whom the children had lived since February of 1998. The children had adjusted well there, and the aunt and uncle were interested in adopting them.
ANALYSIS

I. THE TRIAL COURT ERRED WHEN IT TERMINATED THE PARENTAL RIGHTS OF THE MOTHER WHEN THERE WAS NO EVIDENCE PRODUCED THAT SHE COMMITTED ANY OFFENSE.

II. THE TRIAL COURT ERRED WHEN IT TERMINATED THE FATHER'S PARENTAL RIGHTS AS NO TESTIMONY WAS OFFERED THAT HE DID NOT ATTEND COUNSELING.
*442 ¶ 18. The appellees aptly point out that the sole basis upon which the lower court decided this case was whether or not the parents complied with the Disposition and Reunification Order of October 13, 1997 and the Service Agreement executed by the parents with the DHS. The facts of the case not only set forth clear and convincing evidence that the sexual abuse of both girls transpired, but also set forth clear and convincing evidence that the parents did not comply with this singular requirement. The parents aver that the State did not "prove the negative" that the father did not complete the program required by the court. They argue that there was an attempt to shift to the father the burden of proof that he had attended the Child Sex Abuse Treatment Program at the Gulf Coast Mental Health Center. However, it was because of the very fact that he refused the individual counseling required in that program that there was no record of his attendance to offer. Therefore, the DHS offered the fact that there were no such records. We cannot require the State to produce something that does not exist. The DHS did proffer all Gulf Coast Mental Heath Center records of this family, and no records of the father were found. The father, himself, testified that he did not complete the Gulf Coast Mental Health Center's Child Abuse Treatment Team Program required by the lower court.
¶ 19. There was evidence that after months of failure of the mother to cooperate in discussing the sexual abuse and of the father's failure to obtain counseling though the court ordered program, the father announced that the Service Agreement to which he was a party would not do and that he wanted another one. The record is clear that at that juncture, the court fairly gave the parents three options: (1) appeal the order; (2) acknowledge that the abuses occurred and complete the Child Sex Abuse Treatment Program; or (3) the mother could establish her own home independent of the father and work with the DHS for the return of the children. The parents chose to do none of these. The lower court's long suffering in this matter is evident. We agree with the DHS that pursuant to Miss.Code Ann. § 43-21-603(7)(c)(i) and § 43-21-613(3)(c)(ii)(2)(2000), the lower court could have bypassed the "reasonable efforts" to reunite the children with the parents, expediting the matter as a preference case for termination of parental rights under Miss.Code Ann § 93-15-103(6).
¶ 20. The fact that the mother, as the parents argue, "did not commit any offense," is not the issue the lower court was required to address. The issue was whether the mother had complied with the court's requirement to acknowledge the sexual abuse and successfully complete the particular program designated by the court. She did not.
¶ 21. Moreover, the trial court was justified in its determination that, because the mother allied herself with the perpetrator, she was thus unable to protect the children from further abuse. These concerns were clearly articulated by the judge who voiced frustration over the fact that the mother's early progress was stymied by the father upon his release from jail. The anguish of the mother in losing her children was noted by the judge who regretted, as does this Court, that human frailty of the mother may have played too great a role in her inability to complete the program, consistently acknowledge the sexual abuse and remove herself and the children from the father's domination, if need be.
¶ 22. As to the father, the lower court had clear and convincing evidence, through the subpoenaed records of the Gulf Coast Mental Health Center, through *443 testimony of the clinicians there, and through the testimony of the father, himself, that he did not attempt to obtain the individual counseling required of him by the particular court-ordered program. A judge's findings of fact are viewed under the manifest error/substantial credible evidence test. Veselits v. Cruthirds, 548 So.2d 1312, 1316 (Miss.1989); Bryant v. Cameron, 473 So.2d 174, 179 (Miss.1985). The burden of proof in a termination of parental rights case is by clear and convincing evidence. Miss.Code Ann. § 93-15-109 (Supp.2000); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Once the clear and convincing burden has been met, the best interest of the child is to be considered. Petit v. Holifield, 443 So.2d 874, 877 (Miss.1984). For all of the reasons recited in the facts of this case, and in the discussion of this issue, we disagree with the parents that the DHS failed to meet its burden. We find this issue to be wholly without merit.

III. THE TRIAL COURT ERRED WHEN IT FAILED TO MAKE FINDINGS OF FACT CONCERNING THE BEST INTERESTS OF THE MINOR CHILDREN IN DETERMINING CUSTODY ISSUES.
¶ 23. The parents mischaracterize the use of the "best interests of the child" test as it relates to this case. Miss.Code Ann. § 93-15-103, under which this termination of parental rights case is brought, provides:
Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the DHS should be considered as alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interests of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights.
Miss.Code Ann. § 93-15-103(4) (Supp. 2000).
¶ 24. As indicated in the discussion of the law in Issues I and II, a termination of parental rights case differs significantly from a custody case. Furthermore, in a case such as this, pursuant to Miss.Code Ann. § 93-15-103(3), the petitioner must prove by clear and convincing evidence at least one of the grounds enumerated. Once that burden is met, the trial court determines if termination is in the best interests of the child. Vance v. Lincoln County Dep't of Pub. Welfare, 582 So.2d 414, 417 (Miss.1991).
¶ 25. Once it has been determined that clear and convincing evidence exists as a basis for the termination of parental rights (as in this case, the failure of the parents to implement the plan to which they agreed) the issue becomes whether termination is in the best interests of the child. The criteria under Miss.Code Ann. § 93-15-103 are: (1) whether parental contact is desirable, and (2) whether it is possible to secure placement of the children without terminating parental rights. The first consideration in the present casewhether parental contact is desirableis largely dependent upon the parents' compliance with the case plan, or the lack thereof. The parents' compliance is especially important where sexual abuse and failure to protect are at issue.
¶ 26. Chronicled in the facts of the case is evidence that the father failed to be treated by the Child Sex Abuse Treatment Program and did not complete the plan. He never acknowledged his sexual abuse of the children. After having agreed to the program, he complained that the plan "would not work." He refused to obtain individual counseling for resolution of the *444 sexual abuse issue and substantially interfered with the mother's progress in her individual treatment by actively discouraging it, if not disabling her from completing the program.
¶ 27. Likewise, because of the digression in the mother's progress in counseling, her failure to be successfully discharged, and her own eventual denial of the sexual abuse, it is clear that she was not apt to protect the children in a consistent manner. Although she testified that, if the need arose, she would choose the children over her husband, her conduct and testimony reflect otherwise.
¶ 28. As the issue of durable custody relates to the "best interests" issue, it is noteworthy that the court was mindful of the fact that the children had continued to fare well in their placement with close relatives who were interested in adopting them. Although they had two other children for which to care, and the four added family members presented a financial burden, the aunt and uncle would be able to obtain financial assistance from the DHS if parental rights are terminated. The court below properly noted that the DHS determined that it was in the best interests of the children to be adopted.
¶ 29. Where a trial judge sits without a jury, the trial court's factual determinations will not be disturbed where the record contains substantial supporting evidence. The entire record must be examined and that evidence which supports or reasonably tends to support the findings of fact made by the trial judge together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact, must be accepted. Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss.1987) (collecting authorities). In a bench trial, the trial judge has the sole responsibility of determining the credibility of the witnesses. Grafe v. Olds, 556 So.2d 690, 692 (Miss. 1990).
¶ 30. In the instant case, the trial judge clearly stated that he disbelieved the parents' testimony that Gulf Coast Mental Health Center could no longer help them with counseling. Their failure to complete the plan there, as they had agreed, was a determining factor in the termination of their parental rights. There is substantial evidence supporting the trial court's judgments that termination of parental rights of the parents is in the best interests of the children. Therefore, we find this assignment of error to be without merit.

IV. THE TRIAL COURT ERRED WHEN IT FAILED TO CONDUCT AN INDIGENCY HEARING WHEN THE PARENTS' ATTORNEY WITHDREW FROM THE CASE FOR LACK OF PAYMENT OF A FEE.
¶ 31. We note that both the mother and father had hired attorneys in the past. The parents had filed two motions for continuance and were thus familiar with court procedures. After their attorney commented in the parents' presence concerning their inability to raise the funds to pay him for representation, and after advising them he would not be able to represent them absent payment, they made no claim of indigence. They indicated they were prepared to proceed and produced five witnesses. They proceeded to trial without raising the issue of representation. As the parents failed to raise the issue before the trial court, it may not be considered on appeal to this Court. See In re B.D., 720 So.2d 476 (Miss.1998). This issue is without merit.

V. THE TRIAL COURT ERRED WHEN IT FAILED TO MAKE ANY FINDINGS OF FACT CONCERNING THE ISSUE OF *445 DURABLE CUSTODY AS TO THE MOTHER?
¶ 32. At the conclusion on the hearing on the termination of the parents' rights, the trial court sua sponte raised the issue of the possibility of terminating only J.R.'s rights but not S.R.B.R.'s, thus making possible durable legal custody for the mother, as an alternative to be considered under Miss.Code Ann. § 93-15-103(4). The guardian ad litem had recommended that the court grant the petition to terminate parental rights, but stated that he would not be against durable custody to the mother. He did, however, voice concern about the financial impact on the relatives who had been caring for the children in Chicago for more than a year, if S.R.B.R.'s rights were not terminated, and thus the relatives could not adopt even though the children would continue living with them. The judge certainly implied that this option would be considered as he took the entire case under advisement, and it is clear that he was well aware of the alternatives and conditions under § 93-15-103(4). Although there are no separate and specific findings of fact in the record on this issue, this Court finds that the trial court, having considered the clear and convincing evidence before it, reasoned well that durable legal custody with continued parental contact was not in the best interest of the children. Neither parent requested a findings of fact or conclusions of law pursuant to M.R.C.P. 52. This issue is without merit.

CONCLUSION
¶ 33. None of the parents' claims of error justifies reversing the lower court in this case. After carefully reviewing the record, we cannot say that the lower court erred in its decision to terminate the parental rights of the parents pursuant to Miss.Code Ann. § 93-15-103(3)(d)(ii) (Supp.2000).
¶ 34. The evidence was clear and convincing. The parents deny their children were sexually abused, and the siblings therefore neglected. Of their own volition they failed to comply with the single requirement of completing the counseling program required by the court. The court was of the correct opinion that the mother is psychologically overborne by the father, and thus, unable to protect the children from further abuse. Moreover, the court was mindful of the fact that relatives who had cared for the children since February of 1998 wanted to adopt all four of them. Above all, the lower court, while showing concern and sympathy for the mother, faithfully adhered to the "polestar consideration" of the best interests of the children. Finding no manifest error in the lower court's decision, we affirm.
¶ 35. AFFIRMED.
PITTMAN, C.J., BANKS, P.J., SMITH, MILLS, WALLER, DIAZ AND EASLEY, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY.
NOTES
[1] The oldest child was then 18 years of age, employed and living on her own.