ISHEE, J.,
for the Court.
¶ 1 On December 20, 2005, the Pearl River County Chancery Court entered a directed verdict denying the termination of the parental rights of the father, J.C.W.,[1] regarding his daughter, H.D.W. Aggrieved, the mother, A.C.W., appeals this order. Finding no error, we affirm.
FACTS
¶ 2 The parties to this suit, A.C.W. and J.C.W., were divorced based on irreconcilable differences on July 20, 2000. They had a daughter during the marriage, H.D.W., who was born on September 29, 1999. Prior to the divorce, in January or April 2000, a temporary court order gave A.C.W. custody of the child since J.C.W. did not have a job or anywhere to live. The order granted visitation rights to J.C.W. and ordered him to pay child support. At the time of the filing of this appeal, A.C.W. was engaged, and J.C.W. is married and has a child by his new wife.
¶ 3 On March 17, 2003, the chancellor entered another temporary order granting J.C.W. visitation of H.D.W. for four hours every Saturday morning at Friendship Park. The order allowed the parents to bring visitors, but it explicitly stated that A.C.W.’s parents were not allowed to attend.
¶ 4 At trial, Dr. John Galloway testified for A.C.W. He examined H.D.W. once and met with J.C.W. a few times. It was his opinion, based on his time with 'J.C.W., that the relationship between J.C.W. and the girl was mostly nonexistent, and that was something J.C.W. wanted to change. His testimony concerning J.C.W. revealed that, while J.C.W. always maintained that he would like to have a relationship with *1044 his child, he had previously considered giving up parental rights in light of all the disruptions that had already taken place in their lives.
¶ 5 A.C.W. next called her ex-husband to testify at trial as an adverse witness. According to his testimony, J.C.W. did not visit his daughter after the divorce until July 2001; however, he said that he attempted to visit on numerous occasions but was denied. He testified that he was only allowed to talk to A.C.W.’s parents, and they would make it difficult for him to visit. On an earlier occasion, he retained an attorney to enforce his visitation rights, but he explained that his attorney’s inaction was one of the reasons he failed to visit H.D.W. for some time. Other reasons for his failure to visit his daughter were his unstable financial position and legal problems following the divorce. He also testified that he kept receipts from his purchases at McDonald’s as evidence of his Saturday morning visitations and that he made videotapes of the visitations.
¶ 6 Lastly, A.C.W. took the stand herself and also presented the testimony of her father. They both testified that the child was available for J.C.W. to visit and that he failed to come to visitations on different occasions. According to them, it was J.C.W. who was uncooperative with the visitation. They testified that he would fail to show on Saturday mornings and would send his mother to tell them he could not make it. A.C.W. also claimed that the child’s attitude toward her father changed in that she did not like visiting him at the park anymore.
¶ 7 At the close of the case, the chancellor refused to find by clear and convincing evidence that J.C.W. had abandoned his relationship with H.D.W. While the chancellor noted that there was a six-month period during which J.C.W. did not exercise his visitation, he found that J.C.W. had continued to pay child support during that time, which A.C.W. continued to receive. According to the chancellor, this was evidence that J.C.W. “did not consciously walk away from a relationship with the child.”
¶ 8 The chancellor also refused to find an erosion of the relationship between J.C.W. and H.D.W., which he found had never “been really given a true opportunity to be productive” because of the conflict between the parents. He pointed out that it was A.C.W. who had, since the beginning, frustrated the court’s attempts to allow J.C.W. the visitation to which he was entitled.
¶ 9 The chancery court entered an order dated December 20, 2005, granting J.C.W.’s motion for a directed verdict and denying termination of his parental rights regarding H.D.W. A.C.W. appeals from this order and asserts that the chancellor erred in refusing to terminate J.C.W.’s parental rights.
STANDARD OF REVIEW
¶ 10 Appellate review in a case to terminate parental rights is limited to reviewing the chancellor’s findings under the manifest error/substantial credible evidence test. S.N.C. v. J.R.D., 755 So.2d 1077, 1081(¶ 11) (Miss.2000) (citing Vance v. Lincoln County Dep’t of Pub. Welfare, 582 So.2d 414, 417 (Miss.1991)). On appeal, the court will ask whether there was “credible proof sufficient for the trier of fact to find abandonment by a parent based on clear and convincing evidence.” Id. (citing Ethredge v. Yawn, 605 So.2d 761, 764 (Miss.1992)). However, it is proper to proceed de novo where the trial court has misapplied a controlling rule of law. Id.
ISSUES AND ANALYSIS
¶ 11 A.C.W.’s asserts that the chancellor erred in failing to terminate J.C.W.’s *1045 parental rights because she presented evidence that he failed to exercise visitation or to pay child support and that there was a substantial erosion of the relationship between him and H.D.W.
¶ 12 A.C.W. cites the following statute to support her claims:
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
[[Image here]]
(b) A parent has made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; or
[[Image here]]
(f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment.
Miss.Code Ann. § 93-15-103(3)(b), (f) (Rev.2004). Additionally, the chancellor must find grounds for termination by clear and convincing evidence in order to terminate the parental rights of a parent regarding the child. Miss.Code Ann. § 93-15-109 (Rev.2004).
¶ 13 “It is well settled that a parent’s right to raise her children is of a fundamental nature, and is entitled to great protection, but that parental rights may be terminated when the welfare of the children is threatened. M.L.B. v. S.L.J., 806 So.2d 1023, 1026(¶ 8) (Miss.2000) (citing Vance, 582 So.2d at 417).
¶ 14 As far as A.C.W.’s claim that J.C.W. abandoned his daughter, abandonment is any conduct that “evinces a settled purpose to forego all duties and relinquish all parental claims to the child.” S.N.C., 755 So.2d at 1081(¶11); Natural Mother v. Paternal Aunt, 583 So.2d 614, 618-19 (Miss.1991) (citing Ainsworth v. Natural Father, 414 So.2d 417, 419 (Miss.1982)). The test for abandonment is objective and requires that, “under the totality of the circumstances ... the natural parent has manifested [his] severance of all ties with the child.” Gunter v. Gray, 876 So.2d 315, 320(1121) (Miss.2004) (citing S.N.C., 755 So.2d at 1080(¶ 11)). The supreme court has ruled that “failure alone to pay child support is insufficient to constitute abandonment.” Petit v. Holifield, 443 So.2d 874, 878 (Miss.1984) (citing In re Adoption of a Female Child, 412 So.2d 1175, 1178 (Miss.1982)). The father in Pet-it was able to put on evidence of his inability to pay child support while supporting his wife and himself. Id.
¶ 15 A.C.W. also claims that there was an erosion of the relationship between J.C.W. and the child sufficient to warrant termination of his parental rights. However, the typical case in which erosion of the relationship warranted termination of parental rights is much more extreme than this one. E.g., May v. Harrison County Dep’t of Human Servs., 883 So.2d 74, 78-79 (¶ 12-15) (Miss.2004) (mother breached DHS agreement by continuing to see the child’s father who had been convicted of sexual battery of the eleven-year-old girl); G.Q.A. v. Harrison County Dep’t of Human Servs., 771 So.2d 331, 337(¶ 27) (Miss.2000) (the worst case of child abuse ever to come before the chancellor).
¶ 16 There is also support for the chancellor’s decision not to terminate parental rights when there is interference with the relationship. It was in error for a chancellor to terminate parental rights of a mother who tried to keep a relationship with her children and there was third party *1046 interference with her relationship with the children. De La Oliva v. Lowndes County Dep’t of Pub. Welfare, 423 So.2d 1328, 1331-32 (Miss.1982). Similarly, it was not error for a chancellor to refuse to terminate the parental rights of the father when the mother was part of the reason for the erosion of the relationship. In re M.L.W., 755 So.2d 558, 563(¶22) (Miss.Ct.App. 2000).
¶ 17 Upon review of this case, A.C.W.’s arguments do not convince us that the chancellor was in error in failing to find clear and convincing evidence to support the termination of J.C.W.’s parental rights.
¶ 18 In regards to the abandonment issue, we do not find that J.C.W. had any settled purpose to forgo his duties or his claims to being H.D.W.’s parent. Contrary to this, J.C.W. paid child support and occasionally exercised his visitation rights. The court noted that he had some legal troubles that possibly impacted his ability to visit his daughter and that A.C.W. put up “all kinds of roadblocks” to interfere with his visitation. J.C.W.’s testimony supports these findings by the chancellor.
¶ 19 Although he has done so infrequently, J.C.W. has continued to try to exercise his visitation rights. He is currently up-to-date on all of his child support payments. Furthermore, he has expressed a desire to develop a relationship with H.D.W. While Dr. Galloway’s testimony indicates that J.C.W. may have considered giving up his parental rights, he seemed to be looking to do what was best for the child at the time. At no point did J.C.W. state that he actually decided to give up his rights. We find this to be sufficiently credible evidence to support the chancellor’s finding that J.C.W. did not abandon H.D.W.
¶ 20 The chancellor’s ruling also addresses A.C.W.’s claim of erosion of the relationship between J.C.W. and his daughter. At trial, the chancellor found that A.C.W. had been frustrating J.C.W.’s attempts to exercise his visitation and cited this as a reason not to terminate his parental rights. Furthermore, the temporary order of March 2003 and the testimony of A.C.W.’s father revealed that he and his wife were prohibited, for whatever reason, from attending visitations at the park. The court’s ruling was that the conflicts between J.C.W. and A.C.W. and her parents were part of the reason why a relationship between J.C.W. and the child never developed.
¶ 21 Since the judge found interference by A.C.W. and her parents, the rulings of the courts in M.L.W. and De La Oliva are applicable here. The judge found there was conflict among the individuals involved in the case, specifically, interference with J.C.W.’s visitation rights. We cannot say that the judge was in error in refusing to find an erosion of the relationship in this case. The witnesses seemed to indicate that there was not much of a relationship between J.C.W. and his daughter, and the chancellor found that this was partly because of the difficulties presented by A.C.W. and her parents. Accordingly, he stated that he would not find an erosion of the relationship when the party seeking termination was partly to blame for the lack of a relationship.
¶ 22 In conclusion, we find that it was not error for the chancellor to refuse to terminate J.C.W.’s parental rights. The chancellor found that A.C.W. did not meet the high burden of proving by clear and convincing evidence either that J.C.W. abandoned H.D.W. or that the relationship between J.C.W. and his daughter had substantially eroded because of abuse, neglect, or prolonged absence. This issue is without merit.
*1047 ¶ 23 THE JUDGMENT OF THE PEARL RIVER COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ROBERTS AND CARLTON, JJ., CONCUR.

. We will use initials for the parties to protect the minor’s identity.