CARLTON, J.,
for the Court:
¶ 1. Jimmy Ray Chism Jr. (Jim) appeals the Union County Chancery Court’s judgment terminating his parental rights pursuant to Mississippi Code Annotated section 93-15-103 (Rev.2004). The chancellor terminated Jim’s parental rights upon finding Jim unfit for any form of custody or visitation with his son, Johnny,[1] and upon finding such termination served Johnny’s best interest due to Jim’s diagnosed condition that was unlikely to change -within a reasonable period of time, rendering him unable to assume minimally acceptable care of Johnny.[2] Finding no error, we affirm.
¶ 2. On September 3, 2012, the appellant, Abby Gale Morris Chism Bright (Abby) filed a motion to strike portions of Jim’s brief, alleging that Jim included facts that occurred after the conclusion of the hearing and thus failed to constitute part of the record on appeal. Jim filed a response, asserting that he wanted this Court to take judicial notice of these particular facts. The facts at issue include (1) Jim’s statement in his brief that at the time of the appeal, he was participating in a drug-rehabilitation program and had been released from jail and (2) information taken from redacted portions of the expert witness’s report. We note that Jim acknowledged in his brief that he quoted from a redacted portion of the expert witness’s report. We thus grant Abby’s motion to strike portions of Jim’s brief referring to facts not established in the record below. Therefore, none of the facts at issue in the motion to strike were considered upon review or included in this opinion.
FACTS
¶ 3. The record shows that Abby and Jim married on October 17, 2003. Their marriage produced one child, Johnny, born on March 17, 2004. Jim and Abby divorced on March 10, 2008. Under the divorce decree, Jim and Abby shared joint legal custody of Johnny, with Abby receiving primary physical custody and Jim receiving liberal visitation.
¶ 4. On July 25, 2008, Abby filed an emergency petition for modification of custody. The chancellor entered an order modifying visitation, requiring Jim’s mother, Terri Chism, to supervise Jim’s visitation with Johnny. Then, on September 14, 2009, Jim filed a complaint for contempt, seeking to restore unsupervised visitation with Johnny and to require Abby to execute a quitclaim deed on the marital home the chancellor awarded him as part of the initial divorce decree.
¶ 5. On October 14, 2009, Abby filed a counter-complaint seeking termination of Jim’s parental rights, alleging a substantial erosion of the relationship between Johnny and Jim caused by Jim’s serious neglect of and lack of concern for Johnny. Abby *326 submitted that she had remarried and her present husband, Charles Bright, desired to adopt Johnny following the successful termination of Jim’s parental rights. Pro-eedurally, Jim’s complaint for contempt, for restoration of his unsupervised vitiation, and for execution of a quitclaim deed were before the chancellor. Additionally, Abb/s counterclaim seeking termination of Jim’s parental rights was also before the chancellor.
¶ 6. A trial was held on October 18, 2010, continued on July 12-13, 2011, and concluded on July 14, 2011. The chancellor heard testimony from Jim; Abby; Abb/s husband, Charles; Jim’s father, Dr. Jimmy Chism Sr.; Jim’s mother, Terri; Jim’s sister, Katie Chism; Jim’s girlfriend, Reagan Graham; the guardian ad litem (GAL); and Dr. Samuel Fleming III, a licensed clinical neuropsychol'ogist, who provided the sole expert testimony.
¶ 7. Jim and Abby testified regarding a specific incident that occurred on July 5, 2008. The night before that date, Jim and Abby separately attended a party, where they both consumed alcohol. Jim admitted drinking to the point of intoxication, but Abby denied being intoxicated.[3] On the morning of July 5, 2008, Jim woke up and picked up Johnny from his parents’ cabin. Jim then borrowed a car from a neighbor so that he could drive Johnny to McDonald’s. While they were in the drive-thru line at McDonald’s, with the car in park, a witness observed Jim asleep at the wheel and called the police. The police ticketed Jim for public drunkenness, and called Terri to pick Johnny up at McDonald’s.
¶ 8. Abby testified that in August 2008 she began dating Charles, who was twenty years old at the time. The GAL provided testimony that Abby purposely interfered with Jim’s visitation with Johnny.
¶ 9. Jim testified that as a result of not being able to see Johnny, he became depressed. Jim tested positive for marijuana use in May 2010, and he admitted that he used cocaine and marijuana in February, March, and April 2010. In May 2010, Jim became intoxicated and broke into his neighbor’s house. Afterwards, Jim checked into a treatment facility. Upon release in -October 2010, Jim claims he kept in touch with his sponsor, began attending church, and met his current girlfriend, Reagan. Jim admitted that on November 19, 2010, he left Reagan’s home and began drinking and ingested numerous Xanax pills. That night, Jim broke into the home of his parents’ neighbors. Another neighbor discovered Jim, who was unresponsive, and the neighbor called 911. Jim was arrested and remained incarcerated through the last day of trial. Jim admitted to numerous criminal charges, many of which were filed against him prior to his marriage to Abby and prior to the trial. Jim also admitted to tampering with test samples he provided for a drug screen.
¶ 10. While Jim was incarcerated, Dr. Fleming, a licensed neuropsychologist, met with Jim and conducted an interview and an assessment using the Minnesota Multi-phasic Personality Inventory, and ultimately diagnosed Jim with bipolar disorder related to Jim’s drug and alcohol use. In his report, which was admitted into evidence,[4] Dr. Fleming opined that “with appropriate medication and therapy, [Jim] is capable of becoming a contributing member of society, and it will be possible *327 for [Jim] to be an effective parent to his son.” Dr. Fleming also opined that he did not believe Jim had an alcohol addiction, because, to his knowledge, Jim had not “gone through withdrawals.”
¶ 11. Abby testified that she believed her new husband, Charles, would serve as a steady and better father to Johnny than Jim. Abby stated that she felt it was unhealthy for Johnny that Jim kept “popping in and out of rehab” and “in and out of jail.” Abby admitted that no erosion of the relationship between Jim and Johnny had occurred, and testified that even if the chancellor terminated Jim’s parental rights, she would have no problem with Jim visiting Johnny in the presence of Jim’s parents, as long as Jim remained sober for six months.
¶ 12. The GAL ultimately recommended termination of Jim’s parental rights based upon his understanding that termination was proper if it was impossible for Jim to exercise anything more than supervised visitation. The GAL explained that his interpretation of the statutory phrase “minimally acceptable care” was unsupervised visitation.
¶ 13. On September 8, 2011, the chancellor entered an opinion and judgment terminating Jim’s parental rights and awarding grandparent visitation to Jim’s parents.[5] The chancellor found that “a review of Jim’s history shows a troubling pattern of substance abuse increasing in intensity, risk, and severity of consequences” and determined that “[Jim] exhibits ongoing behavior which would make it impossible to return the minor child to his care and custody because he has a diagnosable condition, specifically alcohol and drug addiction, unlikely to change within a reasonable time.”
¶ 14. Jim now appeals, asserting the following assignments of error, which we quote from Jim’s appellate brief:
Whether the lower court erred'by terminating Jim’s parental rights where the evidence was undisputed that Jim and Johnny had a good relationship, that Jim’s visitation with Johnny had never caused any problems for Johnnyf,] and that other than possibly a single incident where Jim fell asleep in the drive-thru of a McDonald’s, there was no evidence that Jim had ever put Johnny in harm’s way[.]
Whether the lower court erred in terminating Jim’s parental rights when the moving party, Abby, failed to prove by clear and convincing evidence that it was impossible for Jim and Johnny to have a relationship in which Jim could exercise minimally acceptable care[.]
Whether the lower court erred by basing its decision to terminate Jim’s parental rights in part upon Abby’s speculative “fear” as to what might happen if Jim’s rights were not terminated on the one hand, while Abby freely admitted on the other hand that she would have no objection to Jim spending supervised time with Johnny after certain conditions were met[.]
Whether the lower court erred by finding that Jim, who had an undiagnosed bipolar disorder until after these proceedings began and made very substantial efforts to rehabilitate himself, including inpatient treatment, and is now successfully participating in the Union County Drug Court program, had a *328 diagnosable alcohol and drug addiction, unlikely to change within a reasonable time, in contradiction to the testimony of the sole expert, the neuropsychologist who first diagnosed Jim with bipolar disorder.
Whether the lower court’s decision to terminate Jim’s parental rights is erroneous as a matter of law[.]
Whether the lower court’s decision to terminate Jim’s parental rights is based upon sufficient evidence[.]
Whether the lower court erred by basing its decision to terminate Jim’s parental rights in part upon its view that Jim’s ex-wife’s twenty-three[-]year[-] old husband would make a better father.
For the purposes of clarity, we will combine these issues in our discussion.
STANDARD OF REVIEW
¶ 15. “Appellate review in a case to terminate parental rights is limited to reviewing the chancellor’s findings under the manifest error/substantial credible evidence test.” A.C.W. v. J.C.W., 957 So.2d 1042, 1044 (¶ 10) (Miss.Ct.App.2007) (citing S.N.C. v. J.R.D., 755 So.2d 1077, 1081 (¶ 11) (Miss.2000)). “On appeal, the court will ask whether there was ‘credible proof sufficient for the trier of fact to find abandonment by a parent based on clear and convincing evidence.’ ” Id. However, we review questions of law under a de novo standard. Id.
DISCUSSION
¶ 16. Jim argues that the chancellor erred in terminating his parental rights. Specifically, he asserts that Abby failed to provide clear and convincing evidence showing that he exhibited ongoing behavior that would make it impossible to return Johnny to Jim’s care and custody. Jim also argues that the chancellor’s decision to terminate Jim’s parental rights lacked support by substantial evidence.
¶ 17. Mississippi Code Annotated section 93-15-103(3) lists various grounds for involuntary termination of parental rights. This statute clarifies that any one factor listed can justify the termination of parental rights; the party seeking termination of parental rights must prove “at least one of the grounds enumerated” by clear and convincing evidence. S.R.B.R. v. Harrison Cnty. Dep’t of Human Servs., 798 So.2d 437, 443 (¶24) (Miss.2001); Miss.Code Ann. § 93-15-103(3); Miss. Code Ann. § 93-15-103(3). Even where the ground for termination is proven by clear and convincing evidence, the chancellor must still consider whether “termination is in the best interests of the child.” S.R.B.R., 798 So.2d at 443 (¶24). A chancellor’s finding that “the best interest of the [child] favors termination” must be supported by “substantial evidence.” J.C.N.F. v. Stone Cnty.. Dep’t of Human Servs., 996 So.2d 762, 767 (¶17) (Miss.2008).
¶ 18. In the present case, the chancellor cited section 93-15-103(3)(e)(i) as the basis for his decision to terminate Jim’s parental rights. Section 93-15-103(3)(e)(i) allows for the termination of parental rights if:
(e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
(i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally[ ] acceptable care of the child[.]
¶ 19. The chancellor stated that “[a] review of Jim’s history shows a troubling pattern of substance abuse increasing in *329 intensity, risk[,] and severity of consequences.” The chancellor also found that Jim
exhibits ongoing behavior which would make it impossible to return [Johnny] to his care and custody because he has a diagnosable condition, specifically alcohol and drug addiction, unlikely to change within a reasonable time which makes him unable to assume minimally[] acceptable care of [Johnny] and constituting grounds for termination of his parental rights.
¶ 20. The chancellor concluded:
[B]ased on the testimony and evidence presented to the court, and the court’s due consideration to the guardian ad litem’s independent report and recommendation to the court and the best interest of [Johnny], ... the parental rights of [Jim] should be terminated so that a permanent and stable father may assume the role[,] and ... [Johnny] will be eligible for adoption.
¶ 21. The supreme court has estab-' lished that “[an appellate court] will affirm a chancellor’s findings of fact if there is substantial evidence to support them[.]” J.C.N.F., 996 So.2d at 765 (¶ 10) (citation omitted). “This standard of review is highly deferential to the chancellor, who has the opportunity to hear all the testimony and observe the demeanor of all witnesses firsthand.” Id. at 766 (¶ 10),
¶ 22. In turning to examine the record before us, we again acknowledge that the chancellor heard testimony from Jim; Abby; Abby’s husband, Charles; Jim’s father, Dr. Chism; Jim’s mother, Terri; Jim’s sister, Katie; Jim’s girlfriend, Reagan; Jonathan Martin, the GAL; and Dr. Fleming, a licensed clinical neuropsychologist.
¶ 23. During the hearing, Jim admitted to consuming alcohol frequently during the period September 2008 and on July 15, 2009, and he acknowledged that he has suffered from an alcohol addiction since 2005. Jim testified that he attempted to enlist in the United States Army, but the Army rejected him because of an arrest for driving under the influence. Jim also admitted to several criminal charges, but he testified that Johnny was not present for any encounter with law enforcement other than on July 5, 2008. Jim testified that he sought alcohol treatment in July 2009, May 2010, and June 2010.
¶ 24. However, Jim admitted to testing positive for marijuana after a urine test in May 2010. Jim also testified that he used cocaine and marijuana in February, March, and April 2010, during the course of the present litigation. He further admitted to using drugs and alcohol again in November 2010, and he acknowledged the November 19, 2010 incident where he broke into his next-door neighbor’s home, where the neighbors later found him unresponsive. Jim was arrested as a result of the incident, and remained incarcerated during the hearing. Jim testified that Dr. Fleming recently diagnosed him as bipolar, and Jim stated that with proper treatment, he could control himself.
1125. In his order, the chancellor acknowledged Jim’s testimony that he loves Johnny but that he struggles to stay sober. The chancellor also noted Dr. Chism’s testimony that Johnny and Jim “worship” one another, as well as testimony from Jim’s sister, mother, and girlfriend expressing their belief that Jim would remain sober and that Jim posed no threat to Johnny.
¶ 26. The chancellor’s order also reflects that Abby testified that although she frequently drank alcohol to the point of intoxication during her marriage to Jim and took Xanax and Valium during that time, she has used no. illegal drugs since her divorce from Jim. The chancellor noted *330 that Abby “expressed sorrow for her past lifestyle.” Abby testified that she did not find it to be in Johnny’s best interest for him to have visitation with Jim, citing Johnny’s bad attitude and bad behavior after he returns from visits with Jim.
¶ 27. The chancellor also heard testimony from Dr. Fleming, whom the chancellor described in his order as “a licensed neuropsychologist whose practice includes patients in need of substance abuse treatment.” Dr. Fleming opined that Jim possessed no alcohol addiction because he has never suffered withdrawal symptoms. However, as discussed previously, Dr. Fleming met with Jim and performed tests during April and May 2011, after which he diagnosed Jim as bipolar, primarily depressive rather than manic. The chancellor noted that “chronic chemical abuse” was the possible primary cause of Jim’s bipolar disorder. Dr. Fleming testified that Jim’s parents likely enabled Jim’s condition. Dr. Fleming opined, and the chancellor’s order reflects, that if Jim followed his treatment plan, “there is no reason to think that Jim could not completely change.”
¶28. The chancellor’s order reflects that the GAL[6] fully participated in the hearing. The transcript also reflects that the GAL participated in the examination of all witnesses that offered testimony during the hearing. The GAL testified that he received his appointment as GAL for Johnny on November 20, 2009, and that in performing his duties, he interviewed the parties on many occasions, and also interviewed their witnesses. The GAL also met with Johnny’s court-appointed counselor and Johnny’s teacher. The GAL met with the director of the National Council on Alcoholism and Drug Dependence in Tupelo, Mississippi, who administered •& substance abuse screening on Jim in May 2010 and accordingly recommended inpatient treatment.
¶ 29. The GAL testified that he did not believe it was in Johnny’s best interest to have a father figure who was absent for periods of time, and he opined that Jim had failed to make every available effort to see Johnny during the period between July 4, 2008 and October 14, 2009 (the date Abby filed the complaint seeking termination of Jim’s parental rights). The GAL noted that Jim “has had an inability to secure and maintain meaningful employment throughout his adult life,” and that as a result, “his parents have paid his court-ordered child support on his behalf.” The GAL, citing section 93-15-103(3), opined that the record contains “more than clear and convincing evidence” to show that Jim “has a diagnosable condition of alcohol and drug addiction, unlikely to change within a reasonable time, and that condition makes him unable to assume minimally] acceptable care of [Johnny].” The GAL testified that he believed “the statutory requirements have been overwhelmingly met as to grounds for termination,” and that Johnny’s best interest required “termination be ordered.” The GAL clarified that his interpretation of the phrase “minimal acceptable care” in section 93-15-103(3) was that it meant unsupervised visitation.
¶ 30. The chancellor also acknowledged the August 18, 2008 order modifying visitation, imposed as a result of the July 5, 2008 incident where Jim drove to McDonald’s while intoxicated, with Johnny in the car, and then fell asleep at the drive-thru. The police arrived and arrested Jim in front of Johnny. That order provided that Terri would strictly supervise any vis *331 itation between Jim and Johnny. Jim testified at the hearing that “he did not believe [Johnny] was in any danger” during the incident.
¶ 31. After hearing the testimony of the parties, witnesses, and GAL, the chancellor ultimately found that pursuant to section 93-15-103(3):
[Jim] exhibited] ongoing behavior which would make it impossible to return [Johnny] to his care and custody because he has a diagnosable condition, specifically alcohol and drug addiction, unlikely to change within a reasonable time which makes him unable to assume minimally[ ] acceptable care of [Johnny] and constituting grounds for termination of his parental rights.
The chancellor then ordered the termination of Jim’s parental rights.
¶ 32. After our review of the record, we find that the testimony of the parties and witnesses, as well as the GAL’s report and recommendation, supports the chancellor’s finding that Abby proved “at least one of the grounds enumerated” in section 93-15-103(3) by clear and convincing evidence. S.R.B.R, 798 So.2d at 443 (¶24). The chancellor further found the termination of Jim’s parental rights to be in Johnny’s best interest “so that a permanent and stable father may assume the role.” See id. Upon our review, and acknowledging our standard of review, we accordingly find “credible proof’ sufficient to support the chancellor’s decision finding that Abby proved one of the grounds enumerated in section 93-15-103(3) for termination of parental rights by clear and convincing evidence. We therefore find no abuse of discretion[7] and affirm the judgment of the chancellor.
¶ 33. THE JUDGMENT OF THE UNION COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, MAXWELL AND FAIR, JJ„ CONCUR. IRVING, P.J., AND JAMES, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION. ROBERTS, J., NOT PARTICIPATING.

. We use fictitious names as necessary to protect the minor child's identity.

. Miss.Code Ann. § 93-15-103(3).

. The transcript reflects that Jim and his sister both testified that they saw Abby intoxicated the night of the party.

. The record reflects that the chancellor required Jim’s counsel to redact portions of Dr. Fleming’s report.

. The chancellor acknowledged that the GAL recommended that the grandparents’ visitation be without restriction. However, the chancellor stated that since “Dr. Chism periodically engaged in [the consumption of marijuana with Jim,] an illegal activity!,]” the court required Terri to be present during any visitation with Johnny. We further note that the chancellor’s award of grandparent visitation is not an issue on appeal.

. The chancellor’s judgment establishes that the GAL "is a practicing attorney, qualified as a[GAL], and is frequently appointed to serve in that capacity.”

. A.C.W., 957 So.2d at 1044 (¶ 10) (citation omitted) (manifest-error/substantial-credible evidence standard of appellate review is applied to chancellor’s findings in a termination-of-parental rights case).