# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CA-00466-SCT

*S.F.*

*v.*

*LAMAR COUNTY DEPARTMENT OF CHILD
PROTECTION SERVICES BY MARCUS
DAVENPORT, L.J.F. AND Z.E.F., MINORS, BY
AND THROUGH THEIR NEXT FRIEND,
MARCUS DAVENPORT*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/26/2021 |
| TRIAL JUDGE: | HON. WILLIAM E. ANDREWS, III |
| TRIAL COURT ATTORNEYS: | STEVEN PATRICK WANSLEY |
| | ANNA KATHLEEN RUSH |
| | CYNTHIA ANN RE |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY YOUTH COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JENNIFER LOUISE MORGAN |
| | CHAD KENNETH KING |
| | ANNA KATHLEEN RUSH |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MAXINE D. LAWSON-CONWAY |
| | STEVEN PATRICK WANSLEY |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 09/28/2023 |
| MOTION FOR REHEARING FILED: | |

## CONSOLIDATED WITH

## NO. 2022-CA-00695-SCT

*Z. E. F., MINOR, BY THROUGH NEXT FRIEND,
MARCUS D. DAVENPORT*

*v.*

*LAMAR COUNTY DEPARTMENT OF CHILD*
*PROTECTION SERVICES*

DATE OF JUDGMENT:           01/26/2021
TRIAL JUDGE:                  WILLIAM E. ANDREWS, III
COURT FROM WHICH APPEALED:   LAMAR COUNTY YOUTH COURT
ATTORNEY FOR APPELLANT:      CYNTHIA CARSON HOWELL
ATTORNEYS FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                                      BY:  MAXINE D. LAWSON-CONWAY
                                          STEVEN PATRICK WANSLEY
NATURE OF THE CASE:          CIVIL - CUSTODY
DISPOSITION:                 AFFIRMED - 09/28/2023
MOTION FOR REHEARING FILED:

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.    Child Protection Services (CPS) petitioned to terminate the parental rights of both parents of three minor children who were sexually abused by their father. The mother, S.F., objected and argued that she should not lose her parental rights. The trial court granted CPS's petition and terminated the rights of both parents. S.F. appeals.

### FACTS AND PROCEDURAL HISTORY

¶2.    In September 2018, Z.F., L.F., and K.F., minor children and sisters, reported that their stepfather, J.F., who had legally adopted them, had sexually abused them.[1] The children reported the sexual abuse but then recanted. The forensic interviewers noted that the children seemed coached, but CPS did not continue its investigation.

---

[1]K.F. was no longer a minor during the events at issue in this case and is not a part of this proceeding.

¶3. In May 2019, Z.F. again reported sexual abuse by her stepfather. She had a baby at fifteen years old, and DNA tests confirmed that J.F. was the father of her baby. Z.F. and L.F. were removed from the home and were, respectively, adjudicated abused and neglected.

¶4. CPS entered into a service agreement with S.F.; the agency was released from working with S.F. shortly after, however, when it discovered the children were still being taken around J.F. and that S.F. maintained a relationship with J.F.

¶5. At the permanency hearing, the court found that S.F. exhibited "mental abandonment and chronic disregard" for both children through her continued relationship with J.F. and that S.F. lacked protective capacity. The permanency plan was changed to adoption, and CPS then petitioned for termination of both parents' rights, asserting that reunification was not in the best interest of the children.

¶6. The court granted CPS's petition and terminated the rights of both parents, finding that "the mother had refused and failed to protect the children after allegations of sexual abuse came to light. She refused to believe (or process in her words) and continued to live with [J.F.]—even after the DNA results."

¶7. Furthermore, "the previous finding of the youth court in the October 1, 2019, Permanency Order carries great weight and [the youth court] found and adjudicated that the mother lacked protective capacity." Because the evidence supports the court's findings of fact by clear and convincing evidence, this Court affirms.

**DISCUSSION**

3

¶8. "The [judge]'s findings of fact are viewed under the manifest error/substantial credible evidence test." *Vance v. Lincoln Cnty. Dep't of Pub. Welfare*, 582 So. 2d 414, 417 (Miss. 1991) (citing *Bryant v. Cameron*, 473 So. 2d 174, 179 (Miss. 1985)). Under this standard, this Court asks not how it "would have decided the case *ab initio* 'but whether . . . credible proof" exists to support the judge's findings of fact "by clear and convincing evidence." *Ethredge v. Yawn*, 605 So. 2d 761, 764 (Miss. 1992). Moreover, this Court "giv[es] deference to the [youth court's] findings of fact." *G.Q.A. v. Harrison Cnty. Dep't of Hum. Servs.*, 771 So. 2d 331, 335 (Miss. 2000) (citing *S.C.R. v. F.W.K.*, 748 So. 2d 693, 700 (Miss. 1999)).

¶9. I remind the dissent of this standard of review as it goes to great lengths to write its view of the record and recitation of the facts. "This Court will not disturb the [judge]'s opinion when supported by *substantial evidence* unless the [judge] abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Samples v. Davis*, 904 So. 2d 1061, 1064 (Miss. 2004) (internal quotation marks omitted) (quoting *Holloman v. Holloman*, 691 So. 2d 897, 898 (Miss. 1996)). "Even if this Court disagreed with the lower court on the finding of fact and might have arrived at a different conclusion, we are still bound by the [judge]'s findings unless manifestly wrong[.]" *Richardson v. Riley*, 355 So. 2d 667, 668 (Miss. 1978).

¶10. S.F. argues that the court erred by finding clear and convincing evidence existed to terminate her parental rights. She also argues that the court lacked jurisdiction over the termination proceedings because Z.F. was eighteen. Z.F. similarly argues that the youth

4

court erred by terminating S.F.'s parental rights as to her because she was no longer a child under the termination statutes.

¶11. The State argues that jurisdiction attached at the time the petition was filed and may continue past the age of eighteen. The State points to Mississippi Code Section 43-21-151, which grants the youth court jurisdiction over proceedings concerning abused, neglected, and delinquent children. Miss. Code. Ann. § 43-21-151(1) (Rev. 2023). The State relies primarily on the second section of that statute, which provides that

> Jurisdiction of the child in the cause shall attach at the time of the offense and shall continue thereafter for that offense until the child's twentieth birthday, unless sooner terminated by order of the youth court. The youth court shall not have jurisdiction over offenses committed by a child on or after his eighteenth birthday.

Miss. Code Ann. § 43-21-151(2) (Rev. 2023). While that portion of the statute appears to apply to delinquent children and not abused or neglected children due to its reference to the "offense," the foster care laws define "children" as persons under the age of twenty-one who were placed in CPS custody by the youth court. Miss. Code Ann. § 43-15-13(1) (Rev. 2023).

¶12. In terms of children under the jurisdiction of the youth court, reconciling the statutes indicates that the youth court has jurisdiction over them until their twenty-first birthday if they came under the youth court's jurisdiction before the age of eighteen, which occurred here. Accordingly, this issue is without merit.

¶13. Mississippi Code Section 93-15-115 provides that a court may terminate parental rights if it finds by clear and convincing evidence that (a) "[t]he child has been adjudicated abused or neglected[,]" (b) the child has been in CPS custody for at least six months and in

5

that time period, CPS has developed a reunification plan for the parent and child, (c) the court has found after a permanency hearing that CPS has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the reunification plan, "but the parent has failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of the child[,] and" (d) "[t]ermination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set out in Section 93-15-119 or 93-15-121." Miss. Code Ann. § 93-15-115 (Rev. 2021).

¶14. In the judgment terminating parental rights, the court found that termination was appropriate because S.F. engaged in "conduct constituting abandonment or desertion . . . [and is] mentally, morally or otherwise unfit to raise the [children]." *See* Miss. Code Ann. § 93-15-119(1)(a)(i) (Rev. 2021). The court further found that S.F.'s "abusive or neglectful conduct has caused, at least in part, an extreme and deep-seated antipathy by the [children] toward the parents, or some other substantial erosion of the relationship between the parents and the [children] constituting grounds for termination of their parental rights." *See* Miss. Code Ann. § 93-15-121(f) (Rev. 2021).

¶15. "Abandonment is defined as 'any conduct by a parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child.'" ***S.N.C. v. J.R.D.***, 755 So. 2d 1077, 1091 (Miss. 2000). "The test is an objective one: whether under the totality of the

circumstances . . . the natural parent has manifested his severance of all ties with the child."
*Id.* (internal quotation marks omitted) (quoting ***Ethredge***, 605 So. 2d at 764).

¶16.    Here, the children were removed from their home for sexual abuse. A fourteen-year-old became pregnant by her stepfather, which a DNA paternity test confirmed.  This was the second allegation of sexual abuse that had occurred in the household.  The GAL testified that the mother, S.F., was put on notice of sexual abuse as early as 2018.   When S.F. found out about the abuse the second time that resulted in a baby, she did not believe her daughter Z.F. that J.F. was the father of her baby and slapped her.

¶17.    Z.F. was adjudicated an abused child, and L.F. was adjudicated a neglected child as a sibling risk.  The children were placed with their maternal grandparents.  A service plan was put in place for S.F. to be reunited with her children.  Knowing the results of the DNA paternity test and knowing the compliance with the service plan that was required to regain custody of her children, she continued to live with J.F. for two months after the children were removed.

¶18.    A no-contact order was put in place between S.F. and Z.F.  S.F. did not follow the no-contact order. Rather, she used her youngest daughter, L.F., to make contact with Z.F.  CPS viewed social media messages that S.F. used through L.F. and the grandmother to pass messages to Z.F., telling her not to worry about school but to take care of the baby and to do or say what she needed in order for them to be able to come home.

¶19.    The social worker testified that based on her observations of L.F.'s visits with S.F., she believed L.F. was confused.  She testified that, for the most part, visits went well with

L.F., although she did witness once when the visit had to end. S.F. and her parents told L.F. statements like the "agency is letting the devil use them." The social worker testified further that L.F. would get upset. The social worker testified that the communication with S.F. creating the strained relationship between Z.F. and L.F., so while L.F. is close to her mom, she believed the relationship is based on things that are not true. The GAL testified that she believed by S.F.'s actions that she was still blaming Z.F. for her sexual abuse.

¶20. At the termination hearing, S.F. attempted to explain her reasoning for continuing to live with J.F., citing her own personal health problems and not wanting to leave him with nowhere to go. But, while doing so and choosing J.F. over her children, she did not demonstrate to the court an ability to protect her children.

¶21. In *May v. Harrison County Department of Human Services.*, 883 So. 2d 74, 76 (Miss. 2004), children were removed from their home for accusations that the father had raped his daughter. The mother disputed that her husband had molested the child and testified on his behalf. *Id.* The mother failed to comply with the service plan of DHS and continued to have contact with her husband after his conviction of sexual battery of their eleven-year-old daughter. *Id.* This court affirmed the ruling of the youth court terminating the mother's rights for failure "to eliminate ongoing behavior" and finding "a substantial erosion of the relationship between the [minor children] and [the mother], which was caused at least in part by [the mother's] neglect, constituting grounds for termination[.]" *Id.* at 79.

¶22. In *S.R.B.R. v. Harrison County Department of Human Services*, 798 So. 2d 437, 445 (Miss. 2001), children were removed from their home based on allegations of sexual abuse

by the father. DHS moved to terminate parental rights, which the youth court granted. *Id.* at 438. The youth court found that "the parents den[ied] their children were sexually abused, and their siblings therefore neglected." *Id.* at 442, 445. We affirmed the court's termination of parental rights, finding that "the trial court was justified in its determination that, because the mother allied herself with the perpetrator, she was thus unable to protect the children from further abuse." *Id.* at 442.

¶23. By continuing to live with J.F., S.F. evinced a settled purpose to forego all parental duties to protect her children. She did not display responsible parenthood in the time that followed her children being removed from her home. After hearing testimony of the social worker, the GAL, S.F., and her parents at the termination hearing, the judge ruled that

> S.F. clearly exhibits mental abandonment and chronic disregard for the welfare of the children through her continued relationship and support of J.F. This action coupled with other actions shown through the testimony and evidence that it is clear and conclusive proof to the Court that S.F. lacks protective capacity of her daughter['] safety and welfare.

We agree that it was in the best interest of the children for S.F.'s rights to be terminated so that a permanent and stable plan could be made for the children. As such, we find that the youth court did not err by finding she relinquished all parental claims to her children by her omissions and failure to protect.

**CONCLUSION**

¶24. The totality of the circumstances and the evidence presented to the youth court satisfies the grounds for termination. Because S.F. lacked protective capacity toward her

9

children, the youth court did not err by finding clear and convincing evidence that termination was appropriate. As such, we affirm.

¶25. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶26. The termination of parental rights statutes are meant to be employed with the best interests of the child at their heart. Today, the majority eschews that purpose, and instead skews the record, uses novel legal theories, and relies on scant proof to weaponize these statutes to punish a mother it deems less than ideal. In doing so, it strands a teenager in a group home and disinherits an adult child who now resides back with her mother and who begs this Court to restore her mother's parental rights. But the Court paternalistically maintains that the adult child who appeals is incapable of having an opinion about her own best interests or the fact that she, as an adult, has now been disinherited by the courts. Accordingly, I dissent.

¶27. The majority glosses over the record and eliminates many facts that inconvenience its ultimate conclusion. I will, therefore, give a complete recitation of the facts.

¶28. In September 2018, Z.F., L.F., and K.F., minor children and sisters, reported that their stepfather, J.F., who had legally adopted them, had sexually abused them.[2] At a forensic interview regarding these allegations, Z.F. and L.F. recanted, but the forensic interviewers

---

[2]K.F. was no longer a minor during the events at issue in this case, and is not a part of this proceeding.

recommended that CPS continue its investigation, as they had concerns that the children had been coached. CPS did not continue its investigation, and the unproven 2018 allegations are not the subject of the case at hand.

¶29. In May 2019, then-sixteen-year-old Z.F. again reported that J.F. had sexually abused her. Z.F. had previously had a baby, and DNA tests performed in June 2019 confirmed that J.F. was the father of her baby. In this report to CPS, Z.F. alleged that her mother, S.F., slapped her upon learning of these allegations and told her to lie to CPS. The children were removed from the custody of J.F. and S.F.

¶30. CPS first placed the children with their maternal grandparents. During that time, CPS alleges that the children were twice taken around J.F. Once, L.F. was allegedly taken to the family home to pick up clothes for school, and J.F. was present in the home. The children were also taken to church where J.F. was present. At the later termination hearing, the grandparents explained that they had sought explicit permission for both encounters from the judge and social worker, and they thought that the outings had been approved.

¶31. In June 2019, a shelter hearing was held, and Z.F. and L.F. were placed in a licensed resource home. On July 23, 2019, Z.F. was adjudicated to be an abused child and L.F. was adjudicated to be a neglected child. The court adopted reunification with S.F. as the permanency plan for both Z.F. and L.F. on that day. At some point, a guardian ad litem (GAL) was appointed for both children.

¶32. The record is unclear regarding what happened next. An order entered by the court on October 1, 2019, alleges that a hearing on the GAL's motion to terminate efforts at

11

reunification and direct the state to initiate termination of parental rights was held on September 17, 2019. It indicates that it considered the testimony and evidence presented in the September 17, 2019, hearing on the permanency order. Yet, the same order indicates that the social worker spoke with S.F. during a later home visit on September 26, 2019. On September 30, 2019, S.F. and J.F. ceased living together. The order also indicates that on October 1, 2019, the same day the order was signed, the social worker spoke to the family about relative placement and also ensured that visitation with S.F. was held twice a month. The GAL's report indicates that a permanency hearing was held on October 1, 2019, on the matter. The order indicates that neither Z.F. nor L.F. attended any hearing, whenever that hearing was actually held. No transcript of this hearing is in the record.

¶33. In the October 1, 2019, order, the court determined that reunification was not best, and it changed the permanency plans for both children to adoption. The court found that S.F.'s continued relationship with J.F. was not in the best interest of both children, that S.F. exhibited "mental abandonment and chronic disregard" for both children through her continued relationship with J.F., and that S.F. lacked protective capacity. The court further found that the relationship between S.F. and Z.F. was "irreparable," but it made no such finding with regard to L.F. It found that reasonable efforts at reunification were not required under Mississippi Code Section 43-21-601 to -627 (Rev. 2023). S.F.'s visitation with Z.F. was terminated, but she was allowed to continue visitation with L.F.

¶34. On June 26, 2020, CPS filed a Petition to Terminate Parental Rights and made both L.F. and Z.F. petitioners through their next friend, CPS. On the date this petition was filed,

Z.F. was less than two months shy of her eighteenth birthday, and her date of birth was noted in the petition. A hearing on the matter was held on January 12, 2021, after Z.F. had turned eighteen. Z.F. and L.F. were not informed of the hearing and consequently did not attend the hearing. S.F., her parents, a social worker, and the GAL testified. The documentary evidence entered consisted of the DNA results for Z.F.'s child, J.F.'s conviction, the adjudication orders, the permanency orders, the GAL report, a parenting certificate for S.F., and a written narrative by S.F.

¶35. The social worker testified first,[3] and noted that initially CPS entered into a service agreement with S.F., but CPS was then released from that service agreement (approximately two months after it was entered). The social worker claimed that CPS was released because Z.F. and L.F. were still being exposed to J.F. and because "documentation" existed that S.F. maintained a relationship with J.F., and that she did so until J.F. was incarcerated. No documentation or evidence was introduced to show that S.F. maintained a relationship with J.F. until he was incarcerated, and the State admits that S.F. terminated the relationship with J.F. on September 30, 2019, well before his 2020 incarceration. The social worker further claimed that S.F. was taking the children to the church where J.F. was a pastor, but this testimony directly contradicts the undisputed fact that the children were not in S.F.'s custody at that time. Additionally, no documentation directly proving these statements is in the record. On cross-examination, the social worker admitted that she did not know when or whether S.F. began living separately from J.F., but she maintained that they were not living

---

[3]The social worker who testified was not the original social worker assigned to the case and had to rely, at least in part, on simply reading the CPS files.

separately in October 2019. She further admitted that the "documentation" to which she was referring was the permanency order. Moreover, she admitted that it was the grandparents who allowed the children contact with J.F., not S.F., as S.F. did not even have custody of the children when this contact occurred, contradicting her previous testimony about S.F.'s involvement in taking the children to church. The social worker further testified that S.F. maintained that Z.F. was lying about the abuse. She also testified that S.F. was willing to provide the children with food, clothing, and shelter, that S.F. had bought gifts for the children, and that S.F. maintained the visitations she was granted with L.F. The social worker testified that the visitations with L.F. generally went well. She did allege, however, that S.F. broke the no contact order with Z.F. by relaying messages through L.F. The evidence contains no evidence of this allegation. She also testified that she had witnessed L.F. being upset after visits with S.F.

¶36. The social worker concluded that she believed the relationship between Z.F. and S.F. had eroded, but that L.F. was "confused." She stated that L.F. did not believe that J.F. abused Z.F., creating a strained relationship between L.F. and Z.F. "based on things that are being told to her that are not true." She also testified that L.F. is close with S.F. She concluded that S.F. lacked protective capacity because she continued to allow the children around J.F. after learning of the allegations. She also noted that L.F. was currently in a "therapeutic placement" and that Z.F. was in a foster home with her child. She admitted that she knew that S.F. received disability because she had seizures.

14

¶37. The GAL testified and filed her report. The GAL testified that she "believed" that S.F. was put on notice of the abuse in 2018 when the first allegations were made. Again, CPS did not follow up on these allegations or continue any investigation, either. The GAL stated that S.F. lived with J.F. until September 31, 2019. She then testified that she had spent much time with Z.F. and that there is "a clear pattern of alienation" because S.F. slapped Z.F. when she told her she was pregnant and because S.F. would make Z.F. sit at a separate table when the family went out to eat. She testified that "[t]he attitude of L.F. has been consistent with that of her mother's in disbelief." She further testified that the maternal grandparents still do not believe the abuse allegations. She noted that the children were exposed to J.F. while in the grandparents' custody.

¶38. The GAL admitted that the State cannot prove that S.F. was unable to provide food, clothing, shelter, and medical care. She also noted that S.F. is a disabled veteran and received military benefits that CPS received to assist with care for the children. However, the GAL opined that S.F. had abandoned the children via "mental abandonment" for a failure to protect them. The GAL maintained that S.F. never expressed interest in reuniting with Z.F. until CPS indicated that they may put Z.F.'s child up for adoption. She also alleged that S.F. is still blaming Z.F. for the abuse. She admitted that L.F. "[i]s adamant that she wants to come home and live with her mom" but that she does not believe that is in L.F.'s best interest "due to the relationship and the actions that [S.F.] has shown towards Z.F." She maintained that S.F. is unfit to raise the children and that the relationship between Z.F. and S.F. has been substantially eroded.

15

¶39. On cross-examination, the GAL claimed that S.F. was still blaming Z.F. for the abuse because S.F. noted that in 2016, Z.F. had been sent to alternative school for sexual behavior in the school bathroom. Upon S.F.'s objection, the Court noted to S.F.'s attorney that "you don't need to worry about that. I heard that testimony, too. I didn't take it that way. In fact, it was elicited on cross-examination."[4] She also stated that her recommendations were based solely on incidents that occurred from May to September 2019, and that she interviewed each child once after the termination was filed. The GAL also stated that she did not know whether Z.F., with whom she claimed to have spent significant time, was in an adoptive placement. She likewise did not know whether L.F. was in an adoptive placement. She admitted that she had "heard" that Z.F. may want to live with her maternal grandmother, but she stated that she had not heard that Z.F. wanted to live with S.F.

¶40. The court then questioned the GAL, noting that some of the items in her report and testimony "are certainly not within the framework of the record in the case" and asked if the court could consider matters outside the record that she relied on. The GAL replied that the court should consider matters outside the record.

¶41. The children's maternal grandfather testified on behalf of S.F. He testified that J.F. moved out of the marital home in August or September 2019, and that he was not aware of any communication between S.F. and J.F. after that time. He also testified that he believed S.F. to be protective of her children. He did note that she had seizures and received disability due to the seizures.

_____

[4]The testimony was intended to explain why S.F. did not immediately believe Z.F.'s allegations of abuse.

¶42. The children's maternal grandmother also testified. She also testified that J.F. and S.F. separated in August or September 2019 and that S.F. did not have further contact with J.F. She testified that S.F. and L.F. had a very good relationship. She further testified that S.F. did not know of the sexual abuse while the children were in the home and that Z.F. had represented to her family that the father of her child was someone else. Regarding having the children around J.F. when they were in her custody, the grandmother testified that the social worker had given permission to go to the house and get school things for L.F. She further testified that the judge gave them permission to take the children to church, that they did not attend the same church as J.F., but that they did attend some programs that their churches did together.

¶43. S.F. testified on her own behalf. She testified that when she learned of the DNA results in July, she gave J.F. a time frame to leave the marital home. She read her written statement into the record, testifying that she was processing the information when she first received it. She stated that

> Because of my health problems of having multiple seizures and also having suffered three strokes, my doctors, as well as my therapist, all reiterated that I cannot afford to keep getting emotionally wrecked because my health was in jeopardy. I was barely able to make it through a court hearing because of being overwhelmed by all the information that was coming out. I was in total shock, and it made my entire body completely numb.

She testified that she now took ownership of what occurred, and should have been more aware of what was occurring, but that she did not know the abuse occurred until May 2019 when Z.F. reported it. She further testified that she has taken an eight-hour parenting class (the certificate for which was entered into evidence), and that she is in therapy every two

17

weeks. She testified that she and J.F. separated in September 2019, and they were not together when he was incarcerated; she has not had any contact with him since the separation date. She further alleged that "my reaction wasn't because I thought my ex-husband was innocent. My reaction had more to do with learning how to cope with devastating news without it being a health risk so I could be here and alive to be a mother to my children." She asked the court for family counseling, and she requested that the court, if it would not give her children back to her, give them to her parents.

¶44. S.F. further testified about her military service, from which she was medically discharged, and her health issues. She testified that she has pseudo tumor cerebri, which causes chronic migraines and temporary blindness, and she also testified that she has seizures. She is not supposed to drive. She has also had several strokes, the last one in 2017. During her incapacitation from that stroke, when she was wheelchair bound, Z.F.'s child by J.F. was conceived. She testified that, due to her health issues, she had been financially and physically dependent on J.F. in 2019, which had made it more difficult to separate from him. She testified that she did attend different churches and that sometimes J.F. had shown up at the same church, but she did not have contact with him when that occurred. She further maintained that the judge gave permission for everyone to attend church, and the judge made sure that J.F. understood that he was to have no contact with the children.

¶45. Regarding her ability to protect the children, S.F. testified that she has now installed cameras in the home so that she can better monitor what occurs. She also noted on cross-examination that Z.F. told her that the father of her baby was a boy at school, and that there

18

had been behavior by Z.F. that corroborated this, such as Z.F. getting caught having sex at school. So she initially believed Z.F.'s representations that a boy at school was the father of her baby.

¶46. At the end of the hearing, the court terminated the parental rights of J.F., but stated that it would further consider the issue as to S.F. The court then terminated the parental rights of S.F. via order filed January 26, 2021, finding that clear and convincing evidence demonstrated a lack of protective capacity. The court found that S.F. had engaged in abandonment, desertion, or was mentally, morally or otherwise unfit to raise the children. It further found that S.F.'s abusive or neglectful conduct caused "at least in part, an extreme and deep-seated antipathy by the Minor Petitioners toward the parents, or some other substantial erosion of the relationship between the parent and the Minor Petitioners . . . ." It found that termination was in the children's best interests in order to provide stability for the future and to make the teenagers eligible for adoption.

¶47. S.F. and Z.F. both appeal. S.F. argues that the court erred by finding clear and convincing evidence existed to terminate parental rights for several reasons. She also argues that the court lacked jurisdiction over the termination proceedings as applied to then-eighteen-year-old Z.F. Z.F. argues that it was error to include her as a petitioner in the petition to terminate parental rights, that the court erred by terminating the parental rights over an eighteen-year-old, that the GAL failed to protect Z.F.'s best interests, and that the court erred by finding deep-seated antipathy or erosion of the relationship between Z.F. and

S.F.  In her reply brief, S.F. maintains that, sometime after the termination hearing, the youth court released Z.F. from CPS custody and that Z.F. now lives with S.F.

¶48.  "[T]ermination of parental rights is a last resort."  *Chism v. Bright*, 152 So. 3d 318, 323 (Miss. 2014).

> Parents have a "fundamental liberty interest . . . in the care, custody, and management of their child" that cannot be taken away without clear and convincing evidence of the required statutory grounds for termination of parental rights. *Santosky v. Kramer*, 455 U.S. 745, 754, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see also* J. Jackson and M. Miller, *Encyclopedia of Mississippi Law* § 78:39 (2002) (citing Miss.Code Ann. § 93-15-103(3)). State statutes providing for the termination of parental rights are subject to strict scrutiny and "[c]ourts may not add to the enumerated grounds." Deborah H. Bell, *Bell on Mississippi Family Law* 409 (2005) (citing *Gunter v. Gray*, 876 So. 2d 315 (Miss.2004)); *see also* *Rias v. Henderson*, 342 So. 2d 737, 739 (Miss. 1977) (holding that statutes affecting fundamental constitutional rights are subject to strict scrutiny).
> This Court has stated that "[b]ecause parental rights are so important," the "circumstances under which [those rights] can be terminated by the government" are "sharply limit[ed.]" *Gunter v. Gray*, 876 So. 2d at 317.

*Id.* at 322 (alterations in original).  Mississippi law contains a strong presumption that the natural parent should retain parental rights.  *In re V.M.S.*, 938 So. 2d 829, 834 (Miss. 2006).

¶49.  Regarding S.F.'s parental rights, the court terminated her parental rights under Mississippi Code Sections 93-15-115, -119, and -121 (Rev. 2021).

¶50.  Section 93-15-115 provides that a court may terminate parental rights if it finds by clear and convincing evidence that (a) "[t]he child has been adjudicated abused or neglected[,]" (b) the child has been in CPS custody for at least six months and in that time period, CPS has developed a reunification plan for the parent and child, (c) the court has found after a permanency hearing that CPS has made reasonable efforts over a reasonable

20

period to diligently assist the parent in complying with the reunification plan, "but the parent has failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of the child[,] and" (d) "[t]ermination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set out in Section 93-15-119 or 93-15-121." Miss. Code Ann. § 93-15-115 (Rev. 2021).

¶51.    Section 93-15-119 provides that parental rights may be terminated when a parent
has engaged in conduct constituting abandonment or desertion of the child, as
defined in Section 93-15-103, or is mentally, morally, or otherwise unfit to
raise the child, which shall be established by showing past or present conduct
of the parent that demonstrates a substantial risk of compromising or
endangering the child's safety and welfare

and termination "is appropriate because reunification . . . is not desirable toward obtaining a satisfactory permanency outcome[.]" Miss. Code Ann. § 93-15-119(1)(a) (Rev. 2021).[5]

¶52.    The trial court also cited Section 93-15-121(f) as grounds for termination. Section 93-15-121 provides that any ground established by clear and convincing evidence is grounds for termination "if reunification between the parent and child is not desirable toward obtaining

---

[5]The youth court also cited Section 93-15-119(b), which is not a proper citation, as grounds for terminating S.F.'s parental rights. Section 93-15-119(1)(b) (although the youth court simply cited (b) without the (1)) applies to situations in which the perpetrator of a rape or sexual assault that results in the conception of a child may have parental rights to that child terminated. Miss. Code Ann. § 93-15-119(1)(b) (Rev. 2021). That section is so clearly inapplicable to S.F. that any reliance on it with regard to S.F. constitutes plain error. The State concedes that this subsection is inapplicable to this case. Even so, I note the youth court's reliance on this section as further indication that the youth court was less than thorough or careful in its handling of this case, and the majority's wholesale endorsement of the youth court's decision is concerning.

a satisfactory permanency outcome." Miss. Code Ann. § 93-15-121 (Rev. 2021). One of those grounds is when "[t]he parent's abusive or neglectful conduct has caused, at least in part, an extreme and deep-seated antipathy by the child toward the parent, or some other substantial erosion of the relationship between the parent and the child[.]" Miss. Code Ann. § 93-15-121(f) (Rev. 2021). The court found that S.F.'s "abusive or neglectful conduct has caused, at least in part, an extreme and deep-seated antipathy by the child toward the parent, or some other substantial erosion of the relationship between the parent and the child[.]" Miss. Code Ann. § 93-15-121(f) (Rev. 2021).

¶53. Once the burden of clear and convincing evidence that termination is appropriate has been met, a court must still consider the best interest of the child. *In re V.M.S.*, 938 So. 2d at 832.

### 1. *Clear and Convincing Evidence*

¶54. S.F. and Z.F. both argue that the trial court erred by finding clear and convincing evidence to terminate parental rights. The party seeking termination of parental rights has the burden of proving by clear and convincing evidence that termination is appropriate. *Ethredge v. Yawn*, 605 So. 2d 761, 764 (Miss. 1992). Clear and convincing evidence is required by due process in order to overcome the strong presumption that a natural parent should retain his or her parental rights. *In re V.M.S.*, 938 So. 2d at 834-35.

#### a. *Antipathy or Erosion of the Relationship*

¶55. The trial court found that Section 93-15-121(f) applied to both Z.F. and L.F. by clear and convincing evidence. As to L.F., there is absolutely no evidence regarding antipathy or

erosion of the relationship; indeed, the evidence clearly established that L.F. wanted to live with S.F. and that the two enjoyed a close relationship. As to L.F., the court clearly erred by finding termination appropriate on this ground. While the majority does not appear to rely on this ground to any substantial extent, I include an analysis of the youth court's error to demonstrate the youth court's lack of due care in handling this case, and the consequent problematic nature of the majority's endorsement of how the case was handled.

¶56. As to Z.F., the only evidence regarding antipathy or erosion of the relationship was sparse.[6] It included a general opinion by the social worker, who was not the original social worker on the case and who was looking at another's files, that the relationship had "eroded."[7] The GAL also testified that the relationship was irreparable, citing uncorroborated allegations that S.F. slapped Z.F. when she learned of her pregnancy, and uncorroborated allegations that S.F. made Z.F. sit separately from the family when eating out. The GAL noted she had spoken with Z.F. only once since the termination was filed, and she did not relay the contents of that interview. The GAL claimed she spent "significant" time with Z.F. and testified as to her desires, yet she admitted that she did not know what sort of custodial placement Z.F. was in. The State did not produce any direct evidence or testimony regarding the relationship between Z.F. and S.F. Z.F., at age eighteen and made a petitioner to the termination, did not testify and was not present. Such generalized, vague, and uncorroborated assertions regarding unproven allegations of one slap and a few dinners at

---

[6]The fact that Z.F., the child herself, appeals the termination is indicative of the problematic nature of much of the youth court's findings.

[7]Moreover, much of the social worker's testimony contradicted the evidence.

23

restaurants do not amount to clear and convincing evidence of *deep-seated* antipathy or *substantial* erosion of the relationship. Further, the GAL's testimony and opinions in this regard were based solely on interviews with parties who did not testify at trial, and thus the GAL's opinions were based on hearsay. "'[P]ure, rank, un-cross-examined hearsay' by a guardian ad litem cannot be used as substantive evidence." **Ballard v. Ballard**, 255 So. 3d 126, 134 (Miss. 2017) (quoting **McDonald v. McDonald**, 39 So. 3d 868, 887 (Miss. 2010) (Dickinson, J., specially concurring)). While **Ballard** addressed proceedings in chancery court and noted that our rules of evidence apply in chancery court, its holding is also directly applicable to all termination proceedings in any court. Statutory law specifically mandates that termination of parental rights hearings "shall be conducted . . . in accordance with the Mississippi Rules of Evidence." Miss. Code Ann. § 93-15-113(1) (Rev. 2021). Thus, reliance on rank hearsay by a GAL cannot be used as substantive evidence to terminate parental rights. Consequently, the youth court committed manifest error by finding termination appropriate under Section 93-15-121(f), as no evidence of any antipathy or erosion existed regarding L.F., and, at best, scant evidence existed of any antipathy or erosion of the relationship with Z.F.

      b.     *Abandonment or Other Unfitness*

¶57. The youth court also found generally that termination was appropriate under Section 93-15-119(a)(1) due to abandonment, desertion, or mental or moral unfitness. Section 93-15-119 refers to Section 93-15-103 for the definition of *abandonment*. With this, the majority agrees.

24

¶58. *Abandonment* is defined as "any conduct by the parent, whether consisting of a single incident or actions over an extended period of time, that evinces a settled purpose to relinquish all parental claims and responsibilities to the child." Miss. Code Ann. § 93-15-103(a) (Rev. 2021). The statute provides that one way to establish abandonment is, for a child aged three years or older on the date of the termination petition, "that the parent has deliberately made no contact with the child for at least one (1) year." Miss. Code Ann. § 93-15-103(a)(ii) (Rev. 2021). Courts have refined the definition as "any conduct by a parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child." ***S.N.C. v. J.R.D.***, 755 So. 2d 1077, 1081 (Miss. 2000) (internal quotation marks omitted) (quoting ***Natural Mother v. Paternal Aunt***, 583 So. 2d 614, 618 (Miss. 1991)). "The test is an objective one: whether under the totality of the circumstances, be they single or multiple, the natural parent has manifested his severance of all ties with the child." ***Ethredge***, 605 So. 2d at 764.

¶59. The GAL claimed that S.F. demonstrated "mental abandonment" and the State argues on appeal that abandonment is an appropriate ground for termination because S.F. did not believe Z.F.'s allegations and because she failed to protect her children from J.F., as well as because she continued to live with J.F. for approximately four months after the children were removed from the home. The majority agrees. The State argues that S.F. "evinced a settled purpose to forego all parental duties to protect her children because she failed to exercise responsible parenthood." S.F., according to the State, "relinquished all parental claims to her children by her omissions and her failure to protect."

25

¶60. The State offers no caselaw that supports its theory of "mental abandonment." Abandonment is conduct that evinces an intent to relinquish *all* parental duties and responsibilities. While a complete absence of contact is not required to find abandonment, the caselaw makes clear that a clear abdication of all parental duties is central to abandonment. *See **In re Adoption of Z.M.J. v. C.J.***, 365 So. 3d 273 (Miss. Ct. App. 2020). Regarding both children, the evidence fails to establish that S.F. relinquished her claims and responsibilities—the children were removed from the home in which she provided the children food, shelter, and financial support. After removal, S.F. continued to provide financial support and gifts to the children and exercised the visitation she was provided. She also continued with therapy to improve her parenting and parenting classes. Under the circumstances, this was the maximum support S.F. could possibly give. Further, the majority confusingly relies on unsubstantiated testimony that S.F. broke a no contact order to attempt to contact Z.F. as proof that S.F. relinquished all parental claims to Z.F. Yet, even if this unsubstantiated allegation is true, it proves the opposite—that S.F. was endeavoring to exercise her parental claims to Z.F.

¶61. This Court and the Court of Appeals have held that the failure to be an ideal parent does not necessarily lead to a conclusion of abandonment. For example, a father who did not pay child support, who visited his children infrequently, and who called his children's home and sent gifts to them, was deemed by the trial court to have abandoned them. ***Petit v. Holifield***, 443 So. 2d 874 (Miss. 1984). This Court reversed, finding that this evidence, while "'teetering' on the brink[,]" did not "evince a settled purpose to forego all parental

26

rights and relinquish all parental claim to these children." *Id.* at 878. The Court noted that the father "is hardly an ideal parent[,]" but it opined that this did not necessitate a conclusion of abandonment, desertion, or unfitness. *Id.* at 879. In *In re Adoption of a Minor Child*, the natural mother, Gloria, had given birth to K.T.M. as a teenager. *In re Adoption of a Minor Child*, 931 So. 2d 566, 578-79 (Miss. 2006). Two years later, Gloria gave birth to a second child who was the product of rape, Gloria's own parents separated, and she then entered into a temporary custody agreement with the Holmeses for K.T.M.'s benefit. *Id.* Under that agreement, Gloria continually exercised her visitation rights and requested more visitation. *Id.* This Court found that the chancery court erred by finding that Gloria abandoned K.T.M. because she did not manifest her severance of all ties with K.T.M. *Id.* In *N.E. v. L.H.*, the Court of Appeals found the evidence inadequate to support the trial court's finding of abandonment where no evidence of financial support or lack thereof was provided, the mother remained in the child's life, albeit sporadically, and the mother expressed some interest in having the child return to live with her. *N.E. v. L.H.*, 761 So. 2d 956, 964 (Miss. Ct. App. 2000). While the Court of Appeals noted that the mother was "far from an ideal parent and likewise has been far from productive in solidifying what should be termed as a normal parental relationship," it found the evidence supporting or contradicting abandonment could "only be termed as sparse at best." *Id.* at 963-64.

¶62. The majority relies on cases with facts much more extreme than those of the case at hand in its attempt to justify punishing S.F. for a lack of "responsible parenthood" by terminating her parental rights. Maj. Op. ¶¶ 21-23. And the majority fails to explain how

either of these cases support a finding of abandonment, given that neither dealt with the ground of abandonment. In *May v. Harrison County Department of Human Services*, the majority mentions only the mother's support of the father, but omits the facts that May herself beat her children with belts and boards. *May v. Harrison Cnty. Dep't of Hum. Servs.*, 883 So. 2d 74, 76 (Miss. 2004). Moreover, two and one-half years after the children were removed, May was still in a relationship with the father who had raped their daughter and was in jail at the time of the termination hearing, in contrast with the four months at issue in this case. *Id.* at 77-79. In two and a half years, May had not yet completed her court-ordered counseling, in contrast to S.F. completing her counseling and remaining in therapy, as well as completing a parenting class. *Id.* at 78-79. The court found that termination was appropriate based on the grounds that the parent had been responsible for a series of abusive incidents herself, and the statutory ground that the parent failed to implement the placement plan, grounds that are not at issue here. *Id.* Abandonment was not at issue. Likewise, *S.R.B.R. v. Harrison County Department of Human Services* involved a mother who was given years to complete her court-ordered counseling and did not do so, unlike S.F., and S.R.B.R. remained with the perpetrator for years after the children were removed and was still in a relationship with the perpetrator at the time of the termination, unlike S.F. *S.R.B.R. v. Harrison Cnty. Dep't of Hum. Servs.*, 798 So. 2d 437 (Miss. 2001). This case also had nothing to do with abandonment, as both parents were trying to retain custody of their children.

¶63. In this case, the State's novel claim of "mental abandonment" rests solely on its determination that a disabled veteran who was often financially and physically dependent on her husband took approximately four and a half months to cease living with the abuse perpetrator, and struggled with her initial belief of the allegations. And the time from July 23, 2019, when S.F. learned of the DNA results and the court order indicated a reunification plan was put in place, to September 2019, when the GAL began pursuing termination, was less than two months. During this time, S.F. nonetheless provided financial support to her children and exercised her visitation with them. While S.F.'s reactions and conduct from May to September 2019 may not have embodied the conduct of an ideal parent, the State did not prove by clear and convincing evidence that this behavior constituted legal abandonment, or an intentional severance of all ties with and rights to her children.

¶64. On appeal, the State relies on the arguments of abandonment and relinquishment of parental duties, and it does not specifically address mental, moral, or other unfitness. In any event, cases finding termination appropriate due to unfitness involve behavior significantly more egregious than that of S.F. For example, the Court of Appeals affirmed a finding of a mother's unfitness where: the mother had been a drug addict for twenty years; the mother had failed attempts at rehabilitation; the mother was still using drugs at the time of the termination proceedings; the children had found the mother unconscious due to drugs and alcohol at least fifteen times; the children had escaped and wandered freely in dirty diapers due to lack of supervision; the mother had been arrested for DUI with the children in the car; the mother had citations for shoplifting, public intoxication, and felony possession of a

29

controlled substance; and the mother had two outstanding warrants at the time of the proceedings. *A.B. v. R.V.*, 363 So. 3d 855, 859-60 (Miss. Ct. App. 2019). The Court of Appeals also affirmed a finding of unfitness by the mother where, with the mother's knowledge, the mother's partner had punched the child, crashed the child's head into the floor, cut the child with a knife, burned the child with a lighter, scratched the child, and hit the child in the face with various objects. *Bullock v. Miss. Dep't of Child Prot. Servs.*, 343 So. 3d 1079, 1086-88 (Miss. Ct. App. 2022). Additionally, the mother herself had spanked the child with a high heel, hit the child in the face with a belt, choked the child, and locked the child in a closet. *Id.* The State failed to prove by clear and convincing evidence that unfitness existed such that S.F.'s parental rights should be terminated.

      *c.*       *Permanency Outcomes and Best Interests*

¶65. The majority decides "[w]e agree that it was in the best interest of the children for S.F.'s rights to be terminated so that a permanent and stable plan could be made for the children." Maj. Op. ¶ 23. Yet, this statement misrepresents what the youth court did, or, more correctly, what the youth court did not do; the youth court completely failed to make any findings regarding the best interests of the children, nor was the proper evidence put before the youth court for it to make such a determination. Yet, the majority muddles this inconvenient fact and attempts to make it appear as if the youth court made the proper findings. In actuality, the majority must make those factual findings for the first time on appeal to come to this conclusion.

¶66. Central and necessary to a finding of involuntary termination of parental rights is that "reunification . . . is not desirable toward obtaining a satisfactory permanency outcome . . . ." Miss. Code Ann. § 93-15-115(d) (Rev. 2021); *see also* Miss. Code Ann. §§ 93-15-119(1)(a)(ii), -121 (Rev. 2021). At the time of termination, eighteen-year-old Z.F. was in a foster placement and fourteen-year-old L.F. was in a therapeutic placement, which the record indicates was a group home. While permanency plans for adoption were generally referred to by the State, no evidence existed that either child had any realistic opportunity to be adopted, thus it failed to show why termination might help obtain any satisfactory permanency outcome. Indeed, the majority acknowledges that CPS had not bothered to make any permanent plans for teenaged Z.F. and L.F. at the time of termination despite having them in custody for years, but it justifies the termination on the distant and ephemeral hope of a plan, stating that termination was appropriate "so that a permanent and stable plan *could be made* for the children." Maj. Op. ¶ 23 (emphasis added). In contrast, *S.R.B.R.*, which the majority cites favorably, notes that the trial court found that children in that case had been placed with close relatives who were interested in adopting them, and that the children were doing well in that placement. *S.R.B.R.*, 798 So. 2d at 444. The youth court in this case made no such findings about the current well-being or placements of the children, and no evidence exists that any adoptive placement was remotely likely, suggesting that the youth court did not even consider options other than termination. Furthermore, the court failed to make factual findings regarding whether termination was in the children's best interests. *See In re V.M.S.*, 938 So. 2d at 832. The court received no evidence regarding the current welfare of

31

the children or their future prospects. The State presented no evidence regarding their school performance, their emotional states, their health, or anything else about their well-being or welfare while in CPS custody. Without evidence regarding the children's welfare while in CPS custody, it was impossible for the court to ascertain whether such continued custody, and termination of their mother's parental rights, are in their best interests. In this case, it appears that the only thing termination did was deprive the children of their mother's disability benefits, disinherit the children, and orphan them into perpetual foster care. The youth court's inadequate consideration of these factors further supports reversal.

*d.    Guardian ad Litem*

¶67.   In termination proceedings, which are governed by the termination statutes, a GAL must be appointed to protect the interests of the child. Miss. Code Ann. § 93-15-107(1)(d) (Rev. 2021). "The guardian ad litem's presence, however, in no way detracts from the [court's] duty to hear the evidence and make a decision on all of the evidence, not just on the testimony of the guardian ad litem." *S.N.C.*, 755 So. 2d at 1082. A

> guardian ad litem should make recommendations only after providing the court with all material information which weighs on the issue to be decided by the court, including information which does not support the recommendation. The court must be provided all material information the guardian ad litem reviewed in order to make the recommendation. Recommendations of a guardian ad litem must never substitute for the duty of a [court].

*S.G. v. D.C.*, 13 So. 3d 269, 282 (Miss. 2009). The GAL in this case presented no direct evidence. The GAL also admitted that she had heard that Z.F. wanted to return to family, but

neither the GAL nor the youth court followed up on this. And neither sought for the court to hear directly from the teenagers.[8]

¶68. Further, "[w]hile [this Court is] careful to allow the guardian ad litem as much flexibility as possible," a GAL in a termination case should generally be

> prepared to testify as to the present health, education, estate and general welfare of the children. This of necessity would require that [the GAL] have interviewed the minor children, their current custodians, and prospective adoptive parents, if any. Additional record reviews, such as school grades and current medical and or psychological records, in addition to the records already reviewed by [the GAL], would be helpful.

***M.J.S.H.S. v. Yalobusha Cnty. Dep't of Hum. Servs. ex rel. McDaniel***, 782 So. 2d 737, 741 (Miss. 2001). While these are not mandatory factors, it is noteworthy that the GAL did not testify regarding the present health, education, and general welfare of the children. She did not interview their current custodians, nor did she even appear to know who the custodians were or what kinds of placements the children were in. No psychological records or school records were provided or mentioned. While a GAL need not follow a precise checklist, in the case at hand, the failure of the GAL to do any of this contributes to the problematic nature

---

[8]Additionally, Youth Court Practice Rule 13(f) provides that

> [i]f there is a conflict between the child's preferences and the guardian ad litem's recommendation, the court shall retain the guardian ad litem to represent the best interest of the child and appoint an attorney to represent the child's preferences. The court shall then continue the proceedings for a reasonable time to allow the newly appointed attorney to prepare for the cause.

U.R.Y.C.P. 13(f). L.F., at age fourteen, clearly had preferences that directly conflicted with the GAL's recommendation, yet the youth court failed to appoint an attorney to represent L.F.'s preferences. Z.F. arguably had expressed a different preference when allegations that she wanted to return to family surfaced. Again, the youth court did not appoint her an attorney, nor did it even follow up on eighteen-year-old Z.F.'s preferences.

of granting the termination, particularly because such information allows the court to evaluate the best interests of the children. It is clear that, in this case, the GAL's investigation and report were incomplete. The GAL and youth court even made clear on the record that, to credit the GAL's report and testimony, the youth court had to rely on material outside the record. The incomplete report also rested primarily on rank hearsay. *See Ballard*, 255 So. 3d at 134. Such an investigation and report, without more, does not support a termination of parental rights by clear and convincing evidence in the case at hand.

¶69. Overall, the youth court erred by finding that the sparse evidence presented met the State's burden to show by clear and convincing evidence that termination was appropriate. The majority's affirmation of this finding only compounds the errors and sets a precedent for terminating parental rights based on the failure to be an "ideal" parent.

## 2. *Effect of the Age of Child at Time of Termination*

¶70. S.F. argues that the youth court lacked jurisdiction to terminate her rights as to Z.F. because Z.F. was eighteen, and Z.F. similarly argues that the youth court erred by terminating S.F.'s parental rights as to her because she was no longer a child under the termination statutes. The State did not file a brief in response to Z.F.'s briefs or arguments. The majority summarily decides that this argument is incorrect.

¶71. The termination of parental rights statutes define a *child* as "a person under eighteen (18) years of age." Miss. Code Ann. § 93-15-103(b) (Rev. 2021). It further provides that the county court sitting as a youth court only has original exclusive jurisdiction over termination petitions when it has acquired jurisdiction of a child in abuse or neglect proceedings;

34

otherwise, chancery courts have jurisdiction over termination proceedings. Miss. Code Ann. § 93-15-105(1) (Rev. 2021). It is undisputed that, at the time of the termination, Z.F. was no longer a child within the definition of the termination statutes. However, the State argues that jurisdiction attaches at the time the petition was filed, and may continue past the age of eighteen. The State points to Mississippi Code Section 43-21-151, which grants the youth court jurisdiction over proceedings concerning abused, neglected, and delinquent children. Miss. Code. Ann. § 43-21-151(1) (Rev. 2023). The State relies primarily on the second section of that statute, which provides that

> Jurisdiction of the child in the cause shall attach at the time of the offense and shall continue thereafter for that offense until the child's twentieth birthday, unless sooner terminated by order of the youth court. The youth court shall not have jurisdiction over offenses committed by a child on or after his eighteenth birthday.

Miss. Code Ann. § 43-21-151(2) (Rev. 2023). While that portion of the statute appears to apply to delinquent children and not abused or neglected children due to its reference to the "offense," the foster care laws define *children* as persons under the age of twenty-one who were placed in CPS custody by the youth court. Miss. Code Ann. § 43-15-13(1) (Rev. 2023). The termination statutes *clearly* define a child as someone under the age of eighteen, and youth courts *must* use those statutes in termination proceedings. The majority glosses over this stark contrast without any substantive analysis.

¶72. A child over the age of fourteen who is the subject of an adoption is entitled to consent to the adoption or receive personal service as if he or she was an adult. Miss. Code Ann. § 93-17-5(3) (Rev. 2021). Children over the age of twelve are generally allowed to

35

express their preference in custody matters. *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983). Given that much younger children are allowed to express opinions regarding their parentage or custody, and given that Z.F. was clearly no longer a child under the termination statutes at the time of the termination hearing, it is problematic that the youth court did not at least ensure that it hear directly from Z.F. (and fourteen-year-old L.F., for that matter) regarding the termination.

### 3. Children as Petitioners

¶73. Z.F. argues that it was error to include her as a petitioner to the petition. Under Section 93-15-107, the child is not listed as a necessary party to the petition, although previous versions did provide that the children subject to a termination proceeding were necessary parties. Miss. Code Ann. § 93-15-107(1)(c) (Rev. 2021); *see also* H.B. 1240, 2016 Miss. Laws ch. 431, § 9. Although Z.F. was named as a petitioner, she was not served with process or notified of the proceedings. Z.F. points to this as additional evidence that the GAL and youth court were merely "checking boxes" for termination, rather than properly advocating for the children. And it is true that, as a petitioner, Z.F. (and L.F.) should have been notified of the proceedings and allowed to attend, compounding the failure of the youth court to hear from the teenaged and adult children before ordering termination.

¶74. Because the youth court committed manifest error by finding that such sparse evidence met the State's burden of proving by clear and convincing evidence that termination was appropriate, this Court should reverse the termination order as it applies to S.F. and remand the case for further proceedings regarding custody. Instead, the Court disinherits an

adult child against her own will and leaves a teenager in a group home, while also depriving her of her mother's disability benefits, all without a single finding of fact regarding the best interests of Z.F. and L.F. Accordingly, I find the Court's actions are not demonstrably in the best interests of the children and are in defiance of the purpose of the termination statute, and I consequently dissent.

**KITCHENS, P.J., JOINS THIS OPINION.**